COURT OF APPEALS
DECISION
DATED AND FILED

December 9, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2417**

STATE OF WISCONSIN

Cir. Ct. No. 2022CV33

IN COURT OF APPEALS
DISTRICT III

BARBARA A. ANDERSON AND JOHN T. ANDERSON,

PLAINTIFFS-APPELLANTS,

V.

KEITH J. PILGER,

DEFENDANT,

TORREN K. PIES, ANDERSON O'BRIEN, LLP AND NEW YORK MARINE AND GENERAL INSURANCE COMPANY,

DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Portage County: NICHOLAS J. BRAZEAU, JR., Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. In this legal malpractice action, Barbara Anderson and John T. Anderson (JT) appeal from the circuit court's order granting summary judgment in favor of Attorney Torren K. Pies and, in part, in favor of Anderson O'Brien, LLP (the Anderson law firm), insofar as those claims involve Pies' work on Hiram and Floy Anderson's 1998 estate plan.[1] For the reasons that follow, we reject Barbara and JT's arguments and affirm.

## BACKGROUND

¶2 This case concerns Hiram and Floy's estate plans, drafted with the assistance, at separate times, of Pies and Attorney Keith Pilger, both of whom worked at the Anderson law firm. Hiram was himself an attorney, who practiced law for decades, and was "a namesake" of the Anderson law firm. Thus, after he retired from the practice of law, Hiram and Floy engaged Hiram's former partner, Pies, to revise their estate plan.

¶3 In 1998, Hiram and Floy signed new estate planning documents, which modified their primary estate planning vehicle from wills to trusts.[2]

---

[1] Barbara and JT are two of Hiram and Floy's children. Richard Anderson is a third child of Hiram and Floy, and Nathan Anderson and Heather Whitcomb are Richard's children and Hiram and Floy's only grandchildren. Richard, Nathan, and Heather are not parties to the underlying lawsuit or this appeal.

Because the actors in this suit all share a surname, we refer to them by their first names throughout the remainder of this opinion.

[2] Hiram's and Floy's previous wills, which they also created with Pies' assistance in 1989 and amended in 1993, left their estate to their three children, with specific bequests of $10,000 to each grandchild.

According to the record, Hiram worked directly with Pies to revise the estate plan. This new estate plan provided that Hiram and Floy were the settlors of a Revocable Trust that was to be divided, upon the first spouse's death, into at least two trusts: the Family Trust and the Survivor's Trust. When the first spouse died, the Family Trust was created to receive the deceased spouse's individual property and a certain interest in the marital property. The plan also provided, upon the death of the first spouse, for an immediate distribution of $50,000 to each child, $10,000 to each grandchild, and $10,000 to Floy's sister. The remaining income and principal were to be used for the surviving spouse's benefit. The Family Trust was irrevocable upon the death of the first spouse.

¶4 Also upon the death of the first spouse, a Survivor's Trust was created to receive the surviving spouse's individual property and other half-interest in the marital property. The Survivor's Trust was modifiable, and the surviving spouse had broad powers with respect to this trust and could change the Survivor's Trust at any time. Significantly, if no beneficiary designation was made upon the surviving spouse's death, then all of the assets in the Survivor's Trust would pass to the Family Trust and would be distributed according to the Family Trust's distribution provision. The Family Trust provided that upon the death of both spouses, the trust corpus would be distributed into five equal shares, benefitting Hiram and Floy's three children and two grandchildren. This distribution system represented Hiram's explicit directions, per Pies' notes.

¶5 Pies met with Hiram and Floy on March 2, 1998, to review and sign the modified estate plan (the 1998 trust documents). Hiram was provided the 1998 trust documents ahead of the meeting and asked Pies to make some changes, but Pies did not receive any notes specifically from Floy. Nevertheless, Floy signed the documents at the meeting. Pies testified at his deposition that his meeting with

Hiram and Floy lasted over an hour and that his "practice is to review each document, go through it not word by word, but section by section."

¶6      Hiram died in November 2006.  Upon his death, the Revocable Trust funded the irrevocable Family Trust and the revocable Survivor's Trust. Thereafter, Floy worked with Attorney Pilger to amend the Survivor's Trust five times, and his testimony was that each time she executed an amendment, he "also walked through the final distribution," meaning the five-way split of the Family Trust.  According to Pilger, at no time did Floy express to him that she was "dissatisfied with how the [F]amily [T]rust distribution was provided for in the trust document" or seek to amend the provision of the Survivor's Trust so it would no longer transfer to the Family Trust upon her death.  Floy did, however, amend the Survivor's Trust to provide that certain assets would pass only to her three children and not to her grandchildren, which effectively limited the assets that would transfer to the Family Trust.

¶7      Floy died in 2019.  At that time, Richard became the trustee, the proceeds of the Survivor's Trust passed to the Family Trust, and Richard presented several proposals for distributing the assets held in the Family Trust. Barbara and JT, dissatisfied with Richard's proposals, filed Barron County Probate Court Case No. 2020PR45 on June 17, 2020, alleging numerous claims against Richard as trustee.  Richard, for his part, filed a counter petition requesting that the probate court declare one of his distribution proposals to be fair and equitable. Ultimately, after a trial to the court, the probate court denied Barbara and JT's

claims and further stated that "[t]he intention of the [s]ettlors was made clear in the trust: that is, that their wealth would pass equally to their five heirs in trust."[3]

¶8      On February 8, 2022, Barbara and JT filed this legal malpractice suit against Pies, Pilger, the Anderson law firm, and its insurer (collectively, the Attorneys). Barbara and JT alleged that Pies negligently drafted the 1998 trust documents for Hiram and Floy and that Pilger provided negligent advice to Floy in the years after Hiram's death.

¶9      The Attorneys filed a motion for summary judgment, seeking dismissal of this suit because Barbara and JT failed to show that Pies' or Pilger's allegedly negligent conduct frustrated Hiram and Floy's testamentary intent. Based on the parties' briefs, the circuit court issued a written decision granting in part and denying in part the Attorneys' motion.

¶10     According to the circuit court,

> The decedent's intent is found most plainly in the documents themselves. Hiram was an experienced attorney who would have reviewed the documents. In the trust documents from 1998, the clear intent of the testators is that five shares be established in the trust, one for each of their children and one for each of their grandchildren. That language is plainly clear.

The court went on to explain that "[e]vidence from Floy alone that her wishes were to have three shares in the trust rather than five [is] not enough to show that

---

[3] Barbara and JT argue that "Pies places great weight" on the probate court's decision in his brief before this court, but they assert that case "is not relevant or preclusive." (Formatting altered.) The circuit court also found that "[t]here is no estoppel with regard to the issues before this [c]ourt that flow from the Barron County case, the issues are completely different." Beyond supporting his argument by relaying the probate court's findings, Pies does not contend that we are bound by those findings. Thus, we will not address this issue further.

the attorneys frustrated the testamentary purpose of these parties. Hiram and Floy drafted the 1998 [trust] documents together with a single purpose."

¶11  Thus, the circuit court granted Pies' motion for summary judgment and dismissed Barbara and JT's claim against him. The court also granted summary judgment "for those portions of the third claim of the [c]omplaint alleging respondeat superior against the Anderson law firm insofar as those claims involve the work of … Pies done regarding the 1998 estate plan." However, the court denied summary judgment as to the "claims related to work done by … Pilger and the Anderson firm after Hiram's death." Barbara and JT appeal.

## DISCUSSION

¶12  "Generally, an attorney cannot be held liable to a third party for any act committed within the scope of the attorney-client relationship." *MacLeish v. Boardman & Clark LLP*, 2019 WI 31, ¶26, 386 Wis. 2d 50, 924 N.W.2d 799. However, our supreme court carved out an exception to this general rule in *Auric v. Continental Casualty Co.*, 111 Wis. 2d 507, 331 N.W.2d 325 (1983), for third-party beneficiaries of a will or estate plan. Under *Auric*, "the beneficiary of a will may maintain a lawsuit against 'an attorney who negligently drafted or supervised the execution of the will even though the beneficiary is not in privity with that attorney.'" *Tensfeldt v. Haberman*, 2009 WI 77, ¶77, 319 Wis. 2d 329, 768 N.W.2d 641 (citation omitted).

¶13  "The *Auric* exception is a narrow one," and "[i]t is properly applied when 'there is no question that the decedent's intent was thwarted due to the attorney's negligence.'" *MacLeish*, 386 Wis. 2d 50, ¶32 (citing *Tensfeldt*, 319 Wis. 2d 329, ¶72). "Stated differently, the proper threshold question is whether the third[-]party beneficiaries … are attempting to stand in for the deceased

testator to ensure that his [or her] testamentary intent is fulfilled." *See id.*, ¶50. As we have stated previously, "[t]he core concern of the *Auric* court" was "this state's longstanding public policy supporting the right of a testator to make a will and have its provisions carried out." *Beauchamp v. Kemmeter, Lathrop & Clark, L.L.P.*, 2001 WI App 5, ¶18, 240 Wis. 2d 733, 625 N.W.2d 297 (2000) (citation omitted). This public policy "is not promoted by … permit[ting] any disappointed potential beneficiary to maintain suit against a drafting attorney" because "[w]hen the only evidence a plaintiff relies on is extrinsic to the estate planning documents, the testator's intentions are at least as likely thwarted as not." *Id.*

¶14     Thus, as the circuit court properly observed, the question in this case on summary judgment is whether Barbara and JT can show that Pies' negligence thwarted Hiram and Floy's clear testamentary intent. On appeal, Barbara and JT allege that there remain material issues of fact precluding summary judgment as to whether Pies was negligent in the drafting of the 1998 trust documents. They contend that this case is about "Floy's mistaken understanding of the language in the trust based on how the trust was drafted, how it was illustrated to her, and what advice she received about what that language meant," and they argue that their claim against Pies should be presented to a jury for a decision.

¶15     We independently review a grant of summary judgment, using the same methodology as the circuit court. *Hardy v. Hoefferle*, 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2023-24).[4]

¶16    Resolving the question of whether Hiram and Floy's clear testamentary intent was thwarted requires the examination of their trust documents. The interpretation of a testamentary document presents a question of law that we review independently. *See Furmanski v. Furmanski*, 196 Wis. 2d 210, 214, 538 N.W.2d 566 (Ct. App. 1995). "The paramount object of will or trust construction is the ascertainment of the testator's or settlor's intent," *id.* at 215, and "[t]he best evidence of the testator's intent is the language of the document itself," *MacLeish*, 386 Wis. 2d 50, ¶52. "If there is no ambiguity in the document, there is no need for us to look further as to what may have been the testator's or settlor's actual intent." *Furmanski*, 196 Wis. 2d at 215.

¶17    Importantly, as noted above, this appeal challenges only the circuit court's grant of summary judgment in favor of Pies—and the Anderson law firm, to the extent the claim against the Anderson law firm was based on work done before Hiram's death.[5] Therefore, our review, pursuant to *Auric*, must reasonably concern both Hiram's and Floy's testamentary intent at the time Pies drafted the

---

[4] All references to the Wisconsin Statutes are to the 2023-24 version.

[5] As Pies observes in his response brief, Barbara and JT "dedicate significant space and pages of their brief addressing the background of claims that are not on appeal—namely, claims arising out of the alleged negligence of Attorney Pilger in assisting Floy with changes to the Survivor's Trust following the death of Hiram." Given that the circuit court denied summary judgment on their claim against Pilger, we agree that Pilger's representation of Floy after Hiram's death is irrelevant to the issue in this appeal.

1998 trust documents, prior to Hiram's death.[6]  Based on the summary judgment record, we conclude that Barbara and JT have presented no evidence that Hiram's and Floy's clear testamentary intent between 1998 and 2006 was frustrated by Pies' alleged negligence in drafting the 1998 trust documents.  Instead, the 1998 trust documents demonstrate that Hiram and Floy intended that their estate be distributed five ways: to their three children and two grandchildren.

¶18  We begin where we must, with the language of the 1998 trust documents.  *See* ***McGuire v. McGuire***, 2003 WI App 44, ¶10, 260 Wis. 2d 815, 660 N.W.2d 308 ("We determine the intent from the language of the document itself, considered in light of the circumstances surrounding the settlor *at the time the document was executed*." (emphasis added)).  Here, the 1998 trust documents demonstrate that Hiram and Floy intended the Family Trust to be divided into five shares, not three.  According to Article IX.D., addressing the Family Trust, "[a]fter

---

[6] We pause here to note that Barbara and JT curiously argue on appeal that "Hiram's intent is irrelevant." (Formatting altered.)  They fault Pies and the circuit court for placing "great weight on Hiram's intent in 1998 in creating the trust," and they contend that "Hiram's intent, his experience as an attorney, and the timing of his death are not at issue in this case."  Barbara and JT further admit that "there is no dispute" that "Hiram, the chief architect of [the] 1998 estate plans, knew that his children and grandchildren were equal beneficiaries of the Family Trust" because "Hiram was the one who instructed Attorney Pies to draft the Family Trust that way, and Hiram got exactly what he wanted."

Barbara and JT's arguments misunderstand the intricacies of this case.  First, we note, as Pies does, that Barbara and JT fail to provide any legal authority for their proposition that Hiram's intent is irrelevant.  *See* ***State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").  Nevertheless, we choose to address this argument.  All of the undisputed evidence presented indicates that Pies did exactly what he was told by Hiram in creating the 1998 trust documents.  Even more importantly, there is absolutely no evidence presented that Hiram and Floy were *not* of the same mind in terms of their testamentary intent at the time Pies drafted those documents.  In other words, all the evidence demonstrates that Floy had the same testamentary intent as Hiram when they executed the 1998 trust documents with Pies—i.e., to distribute their assets to their children *and* grandchildren—which is why Hiram's intent is absolutely relevant to Barbara and JT's claim *against Pies*.

the Surviving Settlor's death, the Trustee shall divide this Family Trust as then constituted into equal separate shares so as to provide one (1) share for each of the Settlors' children and one (1) share for each then living grandchild of the Settlors." The trust then lists each of Hiram and Floy's children in a numbered paragraph explaining what is to happen if that child is not living at the time the Family Trust is divided. That section ends with an unnumbered paragraph discussing the shares that were to be created for the grandchildren. Further, Article VII.F.2., addressing the Survivor's Trust's distributions, provides that

> [u]pon the Surviving Settlor's death, if and to the extent that the Surviving Settlor shall not have effectively disposed of all property of the Survivor's Trust through a valid and effective exercise of a power of appointment, all of the remaining assets of the Survivor's Trust shall be distributed to the Trustee of the Family Trust to be added to the Family Trust assets and to be thereafter held, administered, and distributed as part of the Family Trust.

¶19 The record on appeal demonstrates that this five-share distribution represented Hiram's explicit direction to Pies. Barbara and JT do not present any written documentation indicating that Hiram or Floy intended for the Family Trust to be split three-ways rather than five-ways during this period. Further, Barbara and JT present no evidence that Floy provided Pies with different information or that she expressed disagreement with the 1998 trust documents. Barbara and JT acknowledge that "Pies received no notes from Floy" regarding the 1998 trust documents. Pies testified at his deposition that he met with both Hiram and Floy for over an hour to review and sign the 1998 trust documents. At that meeting, neither party objected to any language in the 1998 trust documents, and both Hiram and Floy executed the documents, thereby affirming that they accurately reflected their intent. Apart from suggesting that Floy may not have had enough time to understand what was in the documents, Barbara and JT have presented no evidence that the language in the 1998 trust documents did not perfectly represent

10

Hiram and Floy's testamentary intent *at that time*. *See **McGuire***, 260 Wis. 2d 815, ¶10. They also fail to present any evidence demonstrating that either Hiram or Floy changed their intent between the time the 1998 trust documents were signed and Hiram's death in 2006.

¶20 In terms of the "circumstances surrounding" Hiram and Floy "at the time the document was executed," *see **id.***, Pies explains that "Hiram and Floy knew they had two grandchildren through Richard and his wife, and that their other two children (Barbara and JT) were not going to produce grandchildren." Thus, Pies observes, "[t]he testamentary intent—as made clear in the [t]rust—was to keep the family assets in the family," and "a five-way split of the assets ensured that shares of the family business were provided to their grandchildren, the business would stay in the family, and continue to produce income for the next generation."

¶21 Given the above undisputed facts, we conclude that Barbara and JT have failed to show that Pies' alleged negligence frustrated Hiram or Floy's testamentary intent as it was during Pies' representation. We concur with the circuit court's observation that "Hiram was an experienced attorney who would have reviewed the documents" and that "the clear intent of the testators" in the 1998 trust documents "is that five shares be established in the trust, one for each of their children and one for each of their grandchildren. That language is plainly clear."

¶22 Although Barbara and JT allege that "isolated language in the trust is not dispositive" because "[a] court can never be confident as to [the] testator's probable meaning unless it puts itself into the testator's armchair so as to see what he [or she] knew, liked, disliked and how he [or she] talked and wrote about the

matters connected with his [or her] disposition," *see* ***Hamilton v. Forster***, 57 Wis. 2d 134, 138-39, 203 N.W.2d 711 (1973) (citation omitted), we determine that all of the evidence regarding Hiram and Floy's "disposition" during this time supports a plain language reading. (Formatting altered.) Furthermore, all the other evidence Barbara and JT present, as further discussed below, is irrelevant to Pies' representation. Absent any evidence to the contrary, Hiram represented to Pies his *and* Floy's joint intent that the Family Trust be divided five ways, and Pies accurately drafted the 1998 trust documents to effectuate that outcome.

¶23 Moreover, Barbara and JT appear to misapprehend the elements required for a negligence claim against Pies, with whom they are not in privity, in this context. In order for Barbara and JT to maintain a negligence claim against Pies, they must establish that Floy's intent *during Pies' representation of her* was thwarted due to his negligence. *See* ***MacLeish***, 386 Wis. 2d 50, ¶32; ***McGuire***, 260 Wis. 2d 815, ¶10. Based on the evidence presented, they cannot demonstrate that her testamentary intent while she was working with Pies was thwarted. Therefore, Pies has no duty to Barbara and JT who are "stand[ing] in for [Floy] to ensure that [her] testamentary intent is fulfilled." *See* ***MacLeish***, 386 Wis. 2d 50, ¶50; *see also* ***Skindzelewski v. Smith***, 2020 WI 57, ¶8, 392 Wis. 2d 117, 944 N.W.2d 575 ("A plaintiff must prove four elements to establish negligence: duty, breach, causation, and damages."). If we were to reach the opposite conclusion, "this case [would] present[] a considerable risk that an attorney would be held liable, not for thwarting testator intentions, but for properly carrying them out." *See* ***Beauchamp***, 240 Wis. 2d 733, ¶18. Accordingly, we affirm the circuit court's dismissal of Barbara and JT's claim against Pies.

¶24 Barbara and JT, however, present several arguments that they claim demonstrate Floy's alternative intent. According to Barbara and JT, "[t]his case is

entirely about Floy's intent for the [t]rust assets over which she had control (i.e. the Survivor's Trust) and how her intent was that those assets be left equally to only her three children," and because "the Family Trust became irrevocable upon Hiram's death, she was powerless to change its terms."

¶25    First, Barbara and JT argue that the 1998 trust documents were improperly drafted by Pies because they are unclear and inconsistent, which caused Floy's misunderstanding.   For example, Barbara and JT identify the paragraph numbering for the children but not the grandchildren in Article IX.D., *see supra* ¶18, which they assert is improper because "[a] lay person reading the trust on her own could easily conclude that Richard, [JT] and Barbara were the only beneficiaries of paragraph D because they are the only beneficiaries mentioned by name in the enumerated paragraphs."  This numbering system also "stands in stark contrast with how the Family Trust *conspicuously* listed Nathan and Heather by name with their own numbered paragraphs '4' and '5' when they received their 'immediate distributions' of $10,000 from the Family Trust." Accordingly, Barbara and JT contend that the 1998 trust documents were ambiguous.[7]

¶26    Further, Barbara and JT explain that the 1998 trust documents were provided by Pies to Hiram and Floy "in a spiral binder" containing a table of

---

[7] In support, Barbara and JT offer expert opinions from Attorney Philip Miller presented during a deposition, including his opinion that the Family Trust "is not unambiguous as to the five-way split."  Pies states that "[t]his is an attempt to undermine or override the circuit court's legal determination that the trust was unambiguous" and "must be rejected" because "[a]n expert's opinion cannot and does not establish any legal conclusion."  (Formatting altered.)  As we noted above, *see supra* ¶16, the construction of a testamentary document presents a question of law, and we concluded above that Hiram and Floy's intent was clear, *see supra* ¶¶18-21.  Thus, we will not further address Miller's testimony.

contents and a diagram. They observe that "[t]he diagram shows all of the Survivor's Trust's assets flowing to the Family Trust, which are then distributed to 'living children and issue of deceased children, as per Family Trust instructions,' with *three* arrows flowing to these beneficiaries." (Emphasis added.) According to Barbara and JT, Pies was negligent because "[t]his illustration is entirely wrong," and "[t]he failure to include the grandchildren in the diagram as standing on equal footing as the 'living children' is a material omission that misleads how distributions from the trust actually worked." They assert that "[t]his evidence is intrinsic to the estate planning documents themselves, opening the door to Floy's intent." (Formatting altered.)

¶27 We disagree that the numbering of the paragraphs or the diagram tell us anything about Hiram or Floy's intent or, more importantly, that their intent was frustrated. Barbara and JT did not offer any evidence that the numbered or unnumbered paragraphs actually misled Hiram or Floy. They further fail to present any evidence that Hiram or Floy ever looked at the diagram at the beginning of the trust binder between 1998 and 2006, let alone that either or both of them were misled by it. The illustration does not provide evidence of Hiram's or Floy's testamentary intent or that it was somehow different than the plain language of the 1998 trust documents demonstrating a five-way split of the Family Trust. Further, no evidence was presented that Floy relied on either of these things when she later amended the Survivor's Trust. To the extent Barbara and JT are claiming that Pies' alleged negligence with respect to the paragraph numbering or the diagram *caused* Pilger's negligence, this argument is entirely speculative. *See North Highland Inc. v. Jefferson Mach. & Tool Inc.*, 2017 WI 75, ¶34, 377 Wis. 2d 496, 898 N.W.2d 741 ("[S]peculation is insufficient to create a genuine issue of material fact on summary judgment.").

14

¶28    Next, Barbara and JT cite JT's recollection of a conversation he and his wife had with Floy in July or August 2016, in which Floy told them that she was leaving everything to her three children, whom she loved equally.  Although JT's testimony did not appear to state that he specifically asked Floy about the grandchildren, JT's wife testified that JT did, and Floy responded, "Are you crazy?  No, I'm leaving everything to my three children, whom I love equally."  JT's wife also testified that JT asked Floy to confirm this understanding with Pilger, and Floy later called JT, according to his wife, and confirmed that Floy "talked to [Pilger], and everything was as she had said."  JT further opined on Floy's relationship with her grandchildren, stating, "I'm sure she loved them, but they would just piss her off," and giving the examples that Nathan was a "smart mouthed kid" and that the grandchildren "would never send, like, a thank you note."

¶29    Additionally, Barbara and JT cite a conversation that Floy's sister overheard at an unknown time—possibly either when Hiram "was in a nursing home" or after Hiram's death—which led Floy's sister to believe that Floy was checking with a law firm "to make sure that Barb[ara] was included in the estate" or "checking that her estate went to Richard, [JT] and Barb[ara]."  However, Floy's sister admitted that she "really wasn't paying attention when [Floy] called."

¶30    We remain unpersuaded by Barbara and JT's arguments.  As noted, none of their purported "evidence" of Floy's intent occurred anywhere near the time that Pies drafted the 1998 trust documents, such that the evidence would demonstrate that a five-way split was not Floy's intent at the time of Pies' representation.  During JT's testimony, he specifically admitted that Floy never told him how any of the trusts operated; therefore, there is also no direct evidence that Floy actually misunderstood how the trusts operated.  As Pies notes, "the

15

Trust provisions *do* treat [Hiram and Floy's] three adult children equally. Barbara, JT, and Richard each received an equal portion of the Trust as compared to each other." (Emphasis added.) Further, regardless of what JT or his wife testified to or whether their testimonies represent different understandings of Floy's intent, it is irrelevant to the question of what Floy's intent was along with Hiram when the 1998 trust documents were executed. Additionally, Floy's sister's testimony is a nonstarter, given that she did not remember when she overheard the conversation, she admitted that she was not paying attention, she thought they were just discussing Barbara, and she did not state that the discussion involved a three versus a five-way split.

¶31 Next, Barbara and JT identify the five amendments that Floy made to the Survivor's Trust after Hiram's death as evidence of Floy's intent in 1998. As to the second, fourth, and fifth amendments, they assert that "Floy went back and forth on whether to give the grandchildren $10,000," which demonstrates that "she could not have realized that the grandchildren stood to receive two-fifths of her estate" because "[b]eing concerned about duplicate $10,000 distributions when the grandchildren stand to receive millions in distributions is nonsensical." Further, they contend that "[t]he fact that Floy used the [s]econd [a]mendment to give $10,000 to *both* her own sister … and Heather and Nathan further shows Floy's intent that her grandchildren not stand on equal footing as her children, as [Floy's sister] never had a distribution interest from the trust."

¶32 In the third amendment, Floy created an LLC to hold a Michigan cottage property, and only her three children were listed as members of that LLC. Finally, in the sixth amendment, Floy equalized the shares in a closely held family business, called WILCO, between her three children because "Hiram had not always treated Barbara fairly." According to Barbara, "fairness, that all three

16

siblings be equal, was an important thing for [Floy]." Barbara and JT note that neither the third nor the sixth amendment provides for the grandchildren.

¶33    We conclude that the amendments that Floy made to the Survivor's Trust years after Hiram's death are completely unrelated to Pies' drafting of the 1998 trust documents and are, likewise, unrelated to the question presented in this case. In other words, amendments to Floy's Survivor's Trust made years after the creation of the 1998 trust documents and after Hiram's death have no bearing on the question of what Hiram and Floy's testamentary intent was in 1998 or whether that intent was frustrated by Pies' alleged negligence. Beyond that, we observe that evidence that Floy chose to divide the Michigan property and certain WILCO shares equally between only her three children does not demonstrate Floy's intent to prevent the rest of her assets from being divided five ways. Any conclusion to that effect is, again, pure speculation, as it is just as likely that she divided these particular assets in this manner because she was aware of the five-way distribution of the Family Trust and wanted to give her children more of her estate.[8]

---

[8] We also briefly mention Barbara and JT's reference to a bank account that Floy liquidated in March 2015 because it was not earning interest. She gave the proceeds of the account to Barbara, JT, and Richard, and when Richard's wife asked about the grandchildren, Floy stated, "I'll let you take care of them." As with the Michigan property and the WILCO shares, Floy's division of this single bank account into three shares years after the 1998 trust documents were created does not require the inference that she intended her entire estate to be divided into three, rather than five, shares.

Further, Barbara and JT note that Floy's 1989 will, also drafted by Pies, provided for a three-way split of her assets between her children. We are unsure if Barbara and JT intended to argue this point in support of their position, given that this point appeared repeatedly in the "statement of the case" section of their brief-in-chief and not in the argument section. *See* WIS. STAT. RULE 809.19. Regardless, Floy's intent under the 1989 will is not relevant after 1998 because Hiram and Floy purposefully changed their estate plan at that time.

¶34    In summary, Barbara and JT are essentially asking us to ignore the clear, unambiguous testamentary intent of Hiram and Floy as set forth in the 1998 trust documents and reverse the circuit court's grant of summary judgment to Pies based on Barbara and JT's scant evidence, speculation, and irrelevant arguments, none of which demonstrate a material issue of fact.  Because Barbara and JT cannot demonstrate that Pies' negligence thwarted Hiram and Floy's clear testamentary intent, the court properly dismissed their claim against Pies, and their claim against the Anderson law firm related to Pies' representation, on summary judgment for failing to establish that the *Auric* exception applies.

   *By the Court.*—Order affirmed.

   This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.